IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CITRUS WORLD, INC., | |
| Plaintiff, | |
| v. | CIV. NO.: 11-2118(SCC) |
| FERRAIUOLI, TORRES, MARCHAND & ROVIRA, P.S.C., ET AL., | |
| Defendant. | |

## OPINION AND ORDER

Plaintiff filed this suit seeking legal malpractice damages from several defendants, Ferraiuoli, Torres, Marchand & Rovira, P.S.C., its successor Ferraiuoli LLC, and two attorneys of those firms Eugenio Torres-Oyola and Laura Belendez-Ferrero, as well as those attorneys' conjugal partnerships.[1] Plaintiff also sues the firm's professional liability insurer, AIG.

---

1. Throughout this opinion, we will refer collectively to the law firms and their counsel as "Ferraiuoli."

Now, Ferraiuoli and Plaintiff have filed cross-motions for summary judgment, and AIG has filed a partial motion for summary judgment on a matter of policy interpretation. For the reasons we explain below, we grant Ferraiuoli's and AIG's motions in part, and we deny Plaintiff's.[2]

### I.   Factual Background

### A.   Florida Natural and Méndez

Plaintiff Citrus World, Inc., doing business as Florida's Natural Growers ("Florida Natural"), is a cooperative of citrus growers that produces and sells not-from-concentrate juices. Docket No. 50, ¶¶ 1, 9; Docket No. 59, ¶¶ 1, 9. On September 22, 2004, Florida Natural executed a letter agreement with Méndez & Co., pursuant to which Florida Natural appointed Méndez as a non-exclusive distributor of Florida Natural's products; the agreement was effective as of September 1, 2003,

---

**2.**   The parties have requested oral argument on their motions. *See* Docket Nos. 79–81. However, our opinion is that these are matters more easily handled on the papers, and so we DENY the parties' motions. *See Bratt v. IBM*, 785 F.2d 352, 363–64 (1st Cir. 1986) (providing that district courts have the discretion to deny requests for oral argument on motions for summary judgmnet); *PRTC v. Municipality of Guyanilla*, 354 F. Supp. 2d 107, 108 n.1 (D.P.R. 2005) (denying request for oral argument where "the facts and legal arguments have been adequately presented in the parties' briefs and . . . the decisional process would not be significantly aided by oral argument"); *see also* LOC. CIV. R. 7(f).

and it had a duration of two years. Docket No. 48, ¶ 1; Docket No. 62, ¶ 1.1; *see also* Docket No. 50-3. When the agreement expired in 2005, no new agreement was executed between Florida Natural and Méndez, who nonetheless kept doing business as they had during the agreement's term. Docket No. 48, ¶ 2; Docket No. 62, ¶ 1.1; *see also* Docket No. 50, ¶ 13; Docket No. 59, ¶ 13.

During its relationship with Florida Natural, Méndez submitted annual marketing plans, the primary role of which was to "sell more product when on shopper." Docket No. 48, ¶¶ 27–28 (quoting Docket No. 48-14, at 4);[3] Docket No. 62, ¶ 1.1. These plans were developed by Méndez and submitted to Florida Natural, which would review, negotiate, and ultimately approve the plans. Docket No. 48, ¶ 29; Docket No. 62, ¶ 1.1. Specifically, Florida Natural approved the plan and the budget for marketing expenses. Docket No. 48, ¶ 30; Docket No. 62, ¶ 1.1. Marketing performance information had

---

**3.** These facts are based on Sellers's deposition, which repeatedly uses the phrase "shopper" to refer to a noun other than a person who shops. *See* Docket No. 48-14. Ferraiuoli repeats this phrase without attempting to explain the jargon. *See* Docket No. 48, ¶¶ 27–28. But suffice it to say that the surrounding testimony confirms the obvious: that the marketing plans' point was to sell more Florida Natural product.

not been included in the agreement originally signed by
Florida Natural and Méndez.[4] Docket No. 48, ¶ 26; Docket No.
62, ¶ 1.1; *see also* Docket No. 48-15, at 9 (confirming that
marketing performance information was not included in the
original contract).

Marketing plans were also not included in the distribution
agreement originally signed by Florida Natural and Méndez.
Docket No. 48, ¶ 37; Docket No. 62, ¶ 1.1. The agreement
provides, however, that Florida Natural would occasionally
offer promotions, discounts, and allowances, subject to the
parties' agreement. Docket No. 48, ¶¶ 32–33; Docket No. 62,
¶ 1.1. Indeed, Méndez could not go ahead with marketing
expenses that had not been approved by Florida Natural.
Docket No. 48, ¶ 34; Docket No. 62, ¶ 1.1. Florida Natural
likewise controlled the marketing budget that Méndez could

---

**4.** Ferraiuoli submits that the original agreement between Florida Natural
and Méndez was not a "partial distribution agreement." Docket No. 48,
¶ 31. For this, Ferraiuoli relies on Sellers's deposition, where he
testified that the original agreement was not titled a partial distribution
agreement, nor did it have a clause identifying itself as such. Docket
No. 48-16, at 18. But Sellers repeatedly refers to the agreement that way,
and we don't think his testimony as to the agreement's title really
answers the question one way or another. In this sense, Ferraiuoli's
proposed fact is more argument than fact.

use for promotions, and it thus decide what would and would not be funded. Docket No. 48, ¶ 35; Docket No. 62, ¶ 1.1. And Florida Natural determined the marketing budget for any given market. Docket No. 48, ¶ 36; Docket No. 62, ¶ 1.1.

**B. Florida Natural Hires Ferraiuoli**

Sometime in 2006, Florida Natural became concerned about Méndez's handling of its account. Docket No. 50, ¶ 14; Docket No. 59, ¶ 14.[5] Sometime in August 2009, Florida Natural sent Méndez a new proposed distribution and marketing agreement; Méndez countered with a proposal that Florida Natural found unacceptable. Docket No. 50, ¶ 15; Docket No. 59, ¶ 15. The, in October 2009, Florida Natural, through its outside counsel David Latham, retained Ferraiuoli for the purposes of advising Florida Natural regarding its business relationship with Méndez. Docket No. 50, ¶ 16; Docket No. 59, ¶ 16. Ferraiuoli represented that it had knowledge of Law 75 and its

---

**5.** Throughout its statement of uncontested facts, Florida Natural fails to strictly comply with Local Civil Rule 56. Instead of citing a page or paragraph number, it simply cites entire exhibits, some of which are quite lengthy. Ferraiuoli asks that we strike a large portion of Florida Natural's statement for this reason. But while we are frustrated with Florida Natural's flouting of the Rule, we will accept its citations so long as we can easily find the portion of the exhibit to which it is referring—and so long as it appears that Ferraiuoli was able to as well.

nuances.  Docket No. 50, ¶ 17; Docket No. 59, ¶ 17.

On October 27, 2009, Florida Natural sent an email to its counsel at Ferraiuoli.  Docket No. 48, ¶ 3; Docket No. 62, ¶ 1.1. In that email, which was apparently written after a meeting between representatives of Florida Natural and Méndez, Florida Natural asks "[t]hrough what means can we get out of the current agreement" with Méndez?" Docket No. 48-2.[6] The email further proposes three ideas for getting out of the contract, including the institution of legal action based on Méndez's poor performance. *Id.* The email also asks whether, in the event that Florida Natural cannot get out of the agreement, it could nonetheless give business to other distributors. *Id.* The email did not provide any information about Méndez's allegedly poor performance in handling Florida Natural's account.  Docket No. 48, ¶ 5; Docket No. 62, ¶ 1.1.

On November 16, 2009, Ferraiuoli attorney Laura Beléndez issued a memorandum responding to Florida Natural's

---

**6.**  Here and elsewhere, the parties' statements of facts make conflicting claims regarding the central points of various communications. *See* Docket No. 48, ¶ 4; Docket No. 62, ¶ 1.2. Rather than referee these disputes, we will simply describe the documents, all of which are in the record.

questions.[7]  Docket No. 48, ¶ 6; Docket No. 62, ¶ 1.1. After a discussion of whether Florida Natural's and Méndez's relationship was exclusive, the memo turns to the questions asked in Latham's October 27 email. *Id.* As to the question of whether Florida Natural could unilaterally terminate the agreement, Beléndez writes that where a contract does not specify its term, the parties remain at liberty to rescind it. *Id.* at 3 (citing *Castillo v. Smart Prod.*, 289 F. Supp. 138 (D.P.R. 1968)). She writes that because Florida Natural and Méndez had been working past the specified term of their agreement, their relationship as of the memo's writing might be described as indefinite and therefore terminable. *Id.* "Nonetheless," says Beléndez, fixed-term contracts, as well as contracts providing for renewals, can only be terminated with just cause. *Id.* In that case, Florida Natural would need to "prove that Méndez has performed poorly on its obligations." *Id.* at 5. If it did not do so, Méndez could claim damages, and Florida Natural would have to consider its willingness to pay those damages to get out of the contract. *Id.* at 5–6. As to whether, if the relationship continued, Florida Natural could take actions to Méndez's

---

**7.**  On the same day, the memo was sent to David Latham. Docket No. 50, ¶ 21; Docket No. 59, ¶ 21.

detriment, the memo states that Florida Natural could not. *Id.* at 6–7. Finally, the memo ends with a recommendation: "[W]e recommend that you confirm in writing that Méndez acknowledges that the original agreement is still in place, thereby continuing the non-exclusiv[e] nature of the agreement." *Id.* at 7.[8] Beléndez testified during her deposition that the memo had offered, as one line of defense and based on her reading of *Castillo*, that Florida Natural could terminate its agreement with Méndez without just cause. Docket No. 62, ¶ 2.2.[9] Sellers

---

**8.** During Joel Sellers's deposition, he was asked whether he "knew that [Florida Natural] had to have cause in order to terminate Méndez's distribution contract?" Docket No. 48-15, at 5. Sellers answered yes, "as related to [Beléndez's] opinion." *Id.* But during that same deposition, Sellers also testified that Beléndez's memo said that the agreement could be terminated either because of just cause or because of its expiration. Docket No. 62-2, at 2. Because we think Sellers's latter statement is an accurate characterization of the memo's content, we reject Ferraiuoli's proposed uncontested fact that Sellers knew that Florida Natural needed to have just cause to terminate its agreement with Méndez. At best, Sellers's testimony shows that he knew that just cause was required *if* the 2004 agreement was deemed to be in effect, something Beléndez's letter suggested might not be the case.

**9.** Ferraiuoli purports to deny this fact, *see* Docket No. 72, ¶ 2, but given that it is an accurate representation of her testimony, we hardly see how it can do so. Moreover, our own reading of the memo confirms that this *was* a line of defense offered. We note, however, that Beléndez elsewhere testified that she "emphasized" that Florida Natural needed

likewise testified that he understood her memo to mean that Florida Natural could terminate the contract either because it had expired *or* for just cause.[10] Docket No. 62, ¶ 2.3.[11] Ferraiuoli's Eugenio Torres-Oyola reviewed the memorandum. Docket No. 50, ¶ 20; Docket No. 59, ¶ 20.[12]

---

just cause to terminate the agreement. Docket No. 70-1, at 2.

10. Florida Natural also proposes a fact regarding the understanding that another of its attorneys, David Latham, had of the Beléndez memo. *See* Docket No. 62, ¶ 2.4. But the deposition testimony on which the fact is based relates to Latham's impression of the situation after reading the memo and attending a subsequent memo. *See* Docket No. 62-3, at 2. On the record before us, we have no way of separating his impressions of the memo from his impressions of the meeting.

11. Ferraiuoli purports to deny this fact, *see* Docket No. 72, ¶ 2; *see also* Docket No. 48, ¶ 14, because it conflicts with Sellers "previous" testimony that he knew Florida Natural needed to have just cause to terminate the agreement. First of all, both of these statements were made *in the same deposition*, and so the latter statement can easily be read as a clarification of the former, not as a later, contradictory statement. Moreover, the statement offered by Florida Natural is simply a fairer characterization of the Beléndez memo, which indisputably does suggest that Florida Natural might be able to terminate the agreement without just cause. We believe that there is an issue of fact as to what Sellers actually understood based on the Beléndez memo.

12. Florida Natural suggests that Torres was in agreement Beléndez's opinions, *see* Docket No. 50, ¶ 20, but the deposition transcript that it cites does not support that statement. Instead, it only shows that Torres reviewed the memorandum. *See* Docket No. 50-9, at 2. There is then a

On November 18, 2009, David Latham and several other representatives of Florida Natural met with Beléndez to discuss her memorandum (including the *Castillo* case) and Florida Natural's options. Docket No. 50, ¶ 22; Docket No. 59, ¶ 22; *see also* Docket No. 50-7, at 7–8. During her deposition, Beléndez admitted that she knew that Florida Natural would rely on her opinions in making their decision about what to do regarding Méndez. Docket No. 50, ¶ 23; Docket No. 59, ¶ 23. And based on the memo and the meeting, Florida Natural resolved to terminate its relationship with Méndez. Docket No. 50, ¶ 24; Docket No. 59, ¶ 24. So later that same day, Latham and several other Florida Natural representatives met with Méndez and terminated their agreement. Docket No. 50, ¶ 25; Docket No. 59, ¶ 25. On November 19, 2009, Latham emailed Beléndez about that meeting. Docket No. 62-4. According to the email, Florida Natural's representative made three points: (1) that there was no contract, and so there was nothing to cancel; (2) that a new contract had been offered and rejected; and (3) that Florida Natural was dissatisfied with Méndez's performance. *Id.* The email mentions that Latham

---

question posed to Torres about whether he approved the memo, but the answer is not provided in the exhibit. *See id.*

could not gauge Méndez's opinion of the meeting but that he
did not think it would file suit. *Id.*

### C.  The Méndez Lawsuit

But Latham judged wrong, and Méndez sued Florida
Natural on December 16, 2009, alleging unjust termination of
their distribution relationship.  Docket No. 48, ¶ 16; Docket No.
62, ¶ 1.1.  Florida Natural entrusted its defense to Ferraiuoli.
Docket No. 50, ¶ 27; Docket No. 59, ¶ 27.  As part of that
representation, on January 14, 2010, Ferraiuoli issued a memo
to Florida Natural regarding its legal opinion on the case.
Docket No. 50, ¶ 27; Docket No. 59, ¶ 27.[13] After rehearsing the
factual background, the memo begins by discussing whether
the agreement expired in September 2005.  Docket No. 50-8, at
38.  The memo reiterates the analysis of Beléndez's previous
memo, and it again cites *Castillo* for the proposition that a
contract without a fixed length is terminable at will.  *Id.* at

---

**13.** Ferraiuoli purports to object to this fact because the memo has a
heading indicating that it is a draft for discussion purposes. *See* Docket
No. 59, ¶ 27; *see also* Docket No. 50-8, at 31.  The heading
notwithstanding, the document—which was sent to Florida
Natural—expressly purports to "furnish [Ferraiuoli's] legal opinion
regarding" Méndez's complaint. Docket No. 50-8, at 31.  We therefore
deem the fact admitted.

38–39. This time, however, the memo adds a footnote to its discussion of *Castillo* in which it says that that case is "distinguishable" because there, the contract had no fixed length, but in this case, it had a two-year term that had expired. *Id.* at 39 & n.3. The memo also suggests that the original contract ceased to exist in 2005, and that after that point, the parties' relationship was governed by a verbal agreement. *Id.* at 40. But with regard to this analysis, the memo notes that "given the protective nature of Act 75, we will have to aggressively argue this issue before the Court." *Id.* The memo then concludes that Law 75 is probably applicable to the relationship between Méndez and Florida Natural. *Id.* at 41–42. As a line of defense, it then offers that Florida Natural could argue just cause for termination based on (1) Méndez's failure to comply with Florida Natural's invoicing procedures, (2) its failure to create a favorable market for Florida Natural's products, and (3) its "extreme overspending" with regard to marketing. *Id.* at 44. Finally, the memo discusses damages and the litigation strategy. *Id.* at 46–47. Among other things, Ferraiuoli wrote that Florida Natural "can and should file a Counterclaim against Méndez seeking a declaratory judgment declaring that" (1) Florida Natural could terminate the relationship with

Méndez at will because their agreement was indefinite in term, and/or (2) Florida Natural could terminate the agreement for just cause. *Id.* at 47.

On February 19, 2010, Ferraiuoli filed an answer on Florida Natural's behalf, but it did not file the counterclaim that it had recommended. Docket No. 50, ¶ 31; Docket No. 59, ¶ 31. Indeed, Florida Natural never filed a counterclaim, though Ferraiuoli did include just cause as an affirmative defense in the answer. Docket No. 48, ¶¶ 17–18; Docket No. 62, ¶ 1.1. The affirmative defense alleged that Méndez had failed to create a market or acquire clients for Florida Natural's products, and that Méndez had failed to comply with marketing and reporting requirement. Docket No. 48, ¶¶ 19–21; Docket No. 62, ¶ 1.1.

In an email to Latham, Beléndez explained that she would not be filing a counterclaim regarding a claim for money owed, as it did not meet the threshold amount to trigger diversity jurisdiction. Docket No. 50, ¶ 33; Docket No. 59, ¶ 33. Beléndez's email made no mention of a declaratory judgment counterclaim. *See* Docket No. 50-8, at 48. Nonetheless, Latham acceded to Beléndez's judgment. Docket No. 50, ¶ 34; Docket No. 59, ¶ 34. Later, another Ferraiuoli attorney prepared a counterclaim, which included a request for a declaratory

judgment and a claim for collection of monies, as well as a trademark infringement claims. Docket No. 62, ¶ 2.6; Docket No. 70, ¶ 6. No counterclaim was ever filed.

During discovery, Florida Natural reviewed the requests for admission and supplied much of the information that Ferraiuoli requested as part of its defense of Florida Natural. Docket No. 48, ¶ 22; Docket No. 62, ¶ 1.1. Florida Natural reviewed Ferraiuoli's drafts of written discovery; it also answered interrogatories and provided the documentation needed for its answers.  Docket No. 48, ¶ 23; Docket No. 62, ¶ 1.1. On October 20, 2010, Beléndez sent Florida Natural a draft of the answers to requests for admission notified by Méndez.  Docket No. 48, ¶ 24; Docket No. 62, ¶ 1.1. As part of those answers, Ferraiuoli did not admit that the September 2003 letter agreement was the complete and only agreement between the parties. Docket No. 48, ¶ 25; Docket No. 62, ¶ 1.1. It did, however, admit that during the course of their business relationship, Méndez always met or exceeded the annual minimum requirements for the purchase of Florida Natural products. Docket No. 62, ¶ 2.7; Docket No. 70, ¶ 7.

On November 23, 2010, Ferraiuoli sent Florida Natural a letter outlining its views of the discovery process.  Docket No.

50, ¶ 35; Docket No. 59, ¶ 35.[14] The email is rather pessimistic. It describes Méndez's deposition of a representative of Vaquería Tres Monjitas, to whom Florida Natural had transferred its business; the deposition was bad for Florida Natural's position. *See* Docket No. 50-8, at 50–51. Additionally, Méndez had indicated its intent to file suit against Tres Monjitas, whom Florida Natural might be obligated to indemnify. *See id.* at 51. Moreover, Ferraiuoli had come across electronic correspondence in which Florida Natural had described the 2004 agreement as being "in place," meaning that they had treated it as un-expired. *Id.* Finally, the email notes that most of the evidence in favor of Florida Natural's just cause defense did not go to essential elements of its relationship with Méndez, and therefore probably would not persuade the court. *Id.* at 52. The memo ends by apprising Florida Natural of the damages it might have to pay. *Id.* at 53–54.

### D. Florida Natural Seeks New Counsel and Settles with Méndez

---

**14.** Ferraiuoli purports to deny this fact, but we fail to understand the basis for its denial. *See* Docket No. 59, ¶ 35. In any case, the existence of the email is supported by the record, *see* Docket No. 50-8, at 50, and we will describe its contents below rather than accept the parties' characterizations of it.

After receiving the November 23 email, Florida Natural's stateside counsel began looking for a second opinion.  Docket No. 50, ¶ 36; Docket No. 59, ¶ 36. Meanwhile, Ferraiuoli informed Florida Natural that it had brought on Rafael Escalera, an expert on Law 75, to assist in the just cause analysis.   Docket No. 50, ¶ 37.[15] Florida Natural did not authorize the retention of Escalera, *see* Docket No. 50-14, at 1, and it soon retained a new firm, Goldman Antonetti & Córdova, P.S.C. ("Goldman Antonetti"), to help with its defense.  Docket No. 50, ¶ 39; Docket No. 59, ¶ 39. Goldman Antonetti's position was that a defense premised on the alleged expiration of the agreement was untenable.   Docket No. 50, ¶ 40.[16] Goldman Antonetti appeared in the underlying case on

---

**15.** Ferraiuoli purports to deny this fact, stating that the email on which Florida Natural relies "does not state that Mr. Rafael Escalera was brought to assist in the defense of the Méndez lawsuit." Docket No. 59, ¶ 37. Ferraiuoli's position is frivolous; the email states very clearly that Escalera was brought in to help with the just cause analysis. *See* Docket No. 50-14, at 1 ("Also that in order to further perform the just cause analysis . . . we have brought to our litigation team attorney Rafael Escalera who teaches Act 75 seminars and courses in Puerto Rico and is one of our foremost authorities in the matter.").

**16.** Ferraiuoli purports to deny this fact because it is not supported by the cited record evidence. *See* Docket No. 59, ¶ 40. However, the deposition transcript on which the proposed fact is based says explicitly that

January 18, 2011, one day after Méndez had filed its motion for partial summary judgment. Docket No. 50-11, at 4.

According to the motion, the agreement between Florida Natural and Méndez was extended indefinitely by the operation of Law 75, and it was therefore in effect when Florida Natural unilaterally terminated their relationship. MÉNDEZ & CO.'S MOTION FOR PARTIAL SUMMARY JUDGMENT, *Méndez & Co. v. Citrus World Inc.*, Civ. No. 09-2251(JAF) (D.P.R. filed Jan. 17, 2011). Goldman Antonetti filed Florida Natural's opposition to the motion for partial summary judgment on February 7, 2011. *Id.* On March 24, 2011, the court granted Méndez's motion and held that the 2004 agreement was in force as of Méndez's termination on November 18, 2009.  Docket No. 50, ¶ 43; Docket No. 59, ¶ 43. The court also ordered the parties to engage in mediation.  Docket No. 50, ¶ 43; Docket No. 59, ¶ 43.

On April 11, 2011, Jennifer Eden, of Latham's lawfirm, wrote to Beléndez and Torres to tell them that it intended to engage in the court-ordered mediation, where it hoped to

---

Florida Natural's new counsel said that Ferraiuoli's previous advice had been wrong and that "you could never have a contract under Act 75 expire on its own terms." Docket No. 50-13, at 6. The fact is therefore deemed admitted in this regard.

reach a settlement. Docket No. 50, ¶ 47; Docket No. 59, ¶ 47; *see also* Docket No. 50-8, at 58. In the latter, Eden asks Ferraiuoli for a contribution "to any settlement offer in return for a release from [Florida Natural] for any negligence" or malpractice on its part. Docket No. 50-8, at 58. None of the recipients of Eden's letter responded to her, Docket No. 50, ¶ 48; Docket No. 59, ¶ 48, but Torres did write to Florida Natural's Walt Lincer asking him to withdraw the letter or else Ferraiuoli would be forced to withdraw from its representation of Florida Natural in the Méndez case. Docket No. 50-9, at 7. When the letter was not withdrawn, Ferraiuoli withdrew from the underlying case on April 19, 2011. Docket No. 50, ¶ 50; Docket No. 59, ¶ 50.

On April 15, 2011, mediation proved fruitful, and the parties agreed to a settlement dispositive of all claims asserted. Joint Motion for Leave to File Stipulation of Dismissal, *Mendez & Co.*, Civ. No. 09-2251(JAF) (D.P.R. filed Apr. 19, 2011). As part of the settlement, Florida Natural paid Méndez $862,500. Docket No. 50, ¶ 44; Docket No. 59, ¶ 44. Florida Natural also incurred a large amount of legal fees, including: $160,094.24 to Ferraiuoli; $182,761.03 to Goldman Antonetti; $102,083.71 to Zayas Morazzini & Co.; and $95,238.09 to

Latham's firm. Docket No. 50, ¶ 45.[17] Florida Natural also payed Tres Monjitas $24,043.64 to indemnify it for the expenses it occurred as a result of Méndez's lawsuit. Docket No. 50, ¶ 46.[18]

### E. Florida Natural Discovers Ferraiuoli's Alleged Negligence

Once litigation started, Atty. Carlos Rodríguez-Vidal of Goldman, Antonetti & Córdova made an assessment regarding Florida Natural's available defenses, concluding that some had been made unavailable by the termination of Méndez. Docket No. 48, ¶ 38; Docket No. 62, ¶ 1.1. It was Rodríguez—and not Ferraiuoli—that told Florida Natural that it could not prevail

---

**17.** Ferraiuoli purports to deny this fact on the grounds that Florida Natural has not established the reasonableness of these fees. *See* Docket No. 59, ¶ 45. Though the reasonableness of the fees might be relevant to the question of whether the fees could be imputable to Ferraiuoli as damages should Florida Natural prevail, this is not a basis for denying that the costs were in fact incurred by Florida Natural. The fact is deemed admitted.

**18.** Ferraiuoli purports to deny this fact, but it does so by reference to a settlement amount requested by Méndez to settle a potential claim against Tres Monjitas. *See* Docket No. 59, ¶ 46. But this settlement request was never agreed to, and Ferraiuoli fails to explain its relevance to the fact proposed by Florida Natural, which we therefore deem admitted.

in the lawsuit with Méndez. Docket No. 48, ¶ 39; Docket No. 62, ¶ 1.1. And after partial summary judgment was granted in the Méndez suit, it was Rodríguez who told Florida Natural that its ability to rely on the Méndez's alleged incompetence in the handling of reimbursement of advertising and promotional expenses was limited by that ruling. Docket No. 48, ¶ 40; Docket No. 62, ¶ 1.1. Rodríguez also told Florida Natural that the partial summary judgment precluded it from "claiming matters outside the agreement between" Florida Natural and Méndez. Docket No. 48, ¶ 41; Docket No. 62, ¶ 1.1. According to Rodríguez, at trial Florida Natural would only be able to rely on evidence tied to the written agreement that it had executed with Méndez. Docket No. 48, ¶ 42; Docket No. 62, ¶ 1.1.

Atty. Jennifer Eden told Florida Natural that the failure to include a counterclaim against Méndez precluded Florida Natural from employing the just cause defense. Docket No. 48, ¶ 44; Docket No. 62, ¶ 1.1. And it was Eden and Rodríguez who represented Florida Natural during settlement negotiations, which eventually led to a settlement. Docket No. 48, ¶¶ 45–46; Docket No. 62, ¶ 1.1. Ferraiuoli was not involved in the settlement negotiations. Docket No. 48, ¶ 47; Docket No.

62, ¶ 1.1.   Florida Natural did not appeal the partial summary judgment entered against it. Docket No. 48, ¶ 43; Docket No. 62, ¶ 1.1.

## II.  Summary Judgment Standard

A motion for summary judgment will be granted "if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is in genuine dispute if it could be resolved in favor of either party, and it is material if it potentially affects the outcome of the case. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The movant carries the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden may be satisfied by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . or other materials." FED. R. CIV. P. 56(c)(1)(A). The movant may also point to a lack of evidence supporting the nonmovant's case. *See* FED. R. CIV. P. 56(c)(1)(B); *see also Celotex*, 477 U.S. at 325. Once the movant makes a preliminary showing that no genuine issues of

material fact exist, "the nonmovant must produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy [dispute]." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation marks omitted); *see also* FED. R. CIV. P. 56(c)(1).

In evaluating a motion for summary judgment, we view the record in the light most favorable to the nonmovant. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

### III.    Florida Natural's and Ferraiuoli's Cross-Motions for Summary Judgment

Under Puerto Rico law, legal malpractice claims proceed just like any other claims for professional negligence. *See Colon Prieto v. Geigel*, 15 P.R. Offic. Trans. 313, 321 (1984) ("The person who engages in a liberal profession, regardless of the type, and offers and renders his services to the public, is obliged to be adequately informed to do so . . . ." (internal quotations omitted)). There are four elements to such a claim: (1) there must be an attorney-client relationship giving rise to a duty; (2) the attorney must be shown to have breached that duty; (3) the attorney's breach must proximately cause the

client's injury; and (4) the client must sustain actual damages.
*Id.*; *see also Portugues-Santana v. Rekomdiv Int'l Inc.*, 725 F.3d 17,
25 (1st Cir. 2013) (following *Colon Prieto*). The duties that an
attorney has to his client are those found in the Canons of
Professional Ethics, and they include a duty to "be skil[l]ful
and careful" and "to protect the interests of his client." *Colon
Prieto*, 15 P.R. Offic. Trans. at 322. Where an attorney acts
without diligence, he acts with negligence. *Id.* ("Any conduct
at variance with diligence is considered negligent." (internal
quotations omitted)).

The parties dispute the level of causation that must be
proved in a legal malpractice claim. According to Ferraiuoli, a
plaintiff must show that the attorney's negligence was either
the "but for" or proximate cause of the plaintiff's injury. *See*
Docket No. 49, at 6. Of those two choices,[19] proximate cause is

---

**19.** In its motion for summary judgment, Ferraiuoli is not clear about
whether it favors a proximate or "but for" causation analysis. It
acknowledges that Puerto Rico generally follows a proximate causation
rule, but it goes on to note that "courts often use 'but for' analys[e]s" in
legal malpractice cases. Docket No. 49, at 6. In its reply brief, however,
Ferraiuoli comes out clearly in favor of a "but for" causation standard.
*See* Docket No. 71, at 3. But beyond string citing cases from other
jurisdictions, Ferraiuoli makes no effort to explain why "but for"
causation is the better standard, especially given Puerto Rico's general

plainly more appropriate; after all, the official translation of *Colon Prieto* uses the term. 15 P.R. Offic. Trans. at 321 (requiring that the attorney's breach be "the proximate cause of the injury to the client").[20]  Florida Natural, however, argues that it must prove that Ferraiuoli's negligence was the "adequate cause" of its damages. *See* Docket No. 63, at 5. But the difference between that standard and the proximate causation standard is illusory. As the First Circuit has noted, adequate cause is "a concept similar to proximate cause that permits more than one person to be found to have 'caused' the harm." *Tokyo Marine & Fire Ins. Co., Ltd. v. Perez & Cia. de P.R., Inc.*, 142 F.3d 1, 6 n.5 (1st Cir. 1998); *see also, e.g., Echevarria v. Robinson Helicopter Co.*, 824

causation law, and though Ferraiuoli cites Mallen's treatise, it fails to acknowledge that treatise's view that proximate cause is the better standard. Ferraiuoli's insistence on "but for" causation is especially curious, moreover, given that proximate causation is a *more* demanding standard. *See, e.g., Cardenas Mazan v. Rodriguez Rodriguez*, 125 D.P.R. 702, 710 (1990) (explaining that it is not sufficient that a cause have been *necessary* to produce a result, but that the result must also have been the foreseeable consequence of that result); *see also* 1 Ronald E. Mallen, et al., Legal Malpractice § 8.5 (2014 ed.) (explaining that proximate causation requires proof of both "but for" causation *and* foreseeability).

**20.** In the original Spanish, *Colon Prieto* requires that "esa violación sea la causa próxima del daño al cliente." *Colon Prieto v. Geigel*, 115 D.P.R. 232, 239 (1984).

F. Supp. 2d 275, 280 (D.P.R. 2011) ("Adequate cause is a concept similar to proximate cause."). But proximate cause, as a general matter, acknowledges the possibility of multiple proximate causes of an injury. *See, e.g.*, *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) ("[I]t is common for injuries to have multiple proximate causes."); *In re N-500L Cases*, 691 F.2d 15, 28 (recognizing that, under Puerto Rico law, "it is not necessary that [the defendant's] conduct be the sole proximate cause of the [plaintiff's] injury as long as it is a proximate cause" (citing *Widow of Andino v. P.R. Water Resources Auth.*, 93 P.R.R. 168, 178 (1966))). And the leading treatise recognizes that "proximate causation" is the proper test—and that it permits multiple causation. 1 RONALD E. MALLEN, ET AL., LEGAL MALPRACTICE § 8.5 (2014 ed.) (noting that the "major failing" of a "but for" causation rule is that it does not account for the possibility of "multiple causes of the loss," and concluding that the "prevailing view" holds that proximate causation "is the proper analysis"). For these reasons, we will follow the proximate causation standard here.

The parties also dispute whether the "suit within a suit" doctrine is applicable to this case. According to Ferraiuoli, part of proving causation in a legal malpractice case is showing that

the plaintiff's original case "was a valid one and that it got frustrated by the attorney's negligence." Docket No. 49, at 5. This requirement finds support in *Colon Prieto* and *Portugues Santana*, both of which discussed the "case within a case" doctrine in the context of causation. But both of those cases dealt with alleged malpractice occurring in the context of litigation or pre-litigation activities. Here, by contrast, Florida Natural's primary claim relates to allegedly incorrect legal advice that induced it to sever its business relationship with Méndez. No litigation was on-going, and, therefore, there is no "case within a case" for Florida Natural to prove that it would have won. *See Labair v. Carey*, 291 P.2d 1160, 1166 (Mont. 2012) (explaining that the "suit within a suit" framework "calls upon the trier of fact in a legal malpractice case to decide what the outcome for the plaintiff would have been in the underlying case if it had been tried properly"). We do not believe that this should bar Florida Natural's claim however. If Ferraiuoli acted without diligence and gave Florida Natural an incorrect legal opinion, and if Florida Natural acted on that opinion to its detriment, we see no reason why that incorrect opinion could not be the proximate cause of Florida Natural's damages. *Cf. Labair*, 291 P.2d at 469 (noting that "[d]ifferent types of legal

malpractice cases will require different types of evidence and presentation"); *Basic Food Indus., Inc. v. Grant*, 310 N.W.2d 685, 693 (Mich. App. 1981) (noting that "the 'suit within a suit' concept has vitality only in a limited number of situations, such as where an attorney's negligence prevents the client from bringing a cause of action . . . , where the attorney's failure to appear causes judgment to be entered against his client or where the attorney's negligence prevents an appeal from being perfected"); *see also* 1 LEGAL MALPRACTICE § 37:15 ("[I]f the attorney failed to file or pursue a lawsuit . . . the plaintiff will be required to recreate, *i.e.*, litigate, an action that was never tried."). In considering Florida Natural's claims, therefore, we will use the "case within a case" doctrine only insofar as it is required by the claims actually being brought. *See* 1 LEGAL MALPRACTICE § 37:15 ("Where the injury claimed does not depend on the merits of the underlying action or matter, the case-within-a-case methodology is not applicable.").

With these principles in mind, we will proceed to consider Florida Natural's three claims of malpractice: (1) that Ferraiuoli's incorrect statements of law led it to terminate its agreement with Méndez; (2) that Ferraiuoli failed to file a compulsory counterclaim; and (3) that Ferraiuoli's negligent

answers to written discovery led to the evisceration of Florida Natural's just cause defense at trial. As to claims (1) and part of claim (2), the parties have submitted cross-motions for summary judgment; as to claim (3), Ferraiuoli has filed a motion for summary judgment asking that it be dismissed.[21]

## A. Méndez's Termination

Florida Natural claims that Ferraiuoli negligently suggested, in Beléndez's November 16, 2009, memo, that Florida Natural's relationship with Méndez could be terminated at will, as it was expired. It says, furthermore, that in reliance on this negligence, it did in fact terminate its relationship with Méndez, which led to a lawsuit and an expensive settlement. Ferraiuoli's position is that there was no negligence in the Beléndez memo, which "extensively and cautiously advised on the elements of just cause to terminate an agreement" under

---

**21.** We do not agree with Ferraiuoli's suggestion that because Florida Natural has not affirmatively sought summary judgment as to claim (3) and part of claim (2) it has therefore abandoned such a claim. Ferraiuoli cites to nothing in support of such a proposition, and we are inclined to see Florida Natural's decision as a recognition that there is not sufficient evidence in the record at this stage for it to win on that claim at this stage of the proceedings; we would, therefore, construe Florida Natural's motion as one for partial summary judgment, especially given that it has defended against Ferraiuoli's motion for summary judgment on these same grounds.

Law 75. Docket No. 49, at 9. Essentially, Ferraiuoli's claim is that the memo was clear that Florida Natural needed to have just cause to terminate Méndez.

This presents a close question. On the one hand, Ferraiuoli was surely mistaken in relying on *Castillo* for the proposition that Florida Natural might be able to get out of the agreement because it is indefinite. In *Castillo*, a distributor sued a principal under Law 75 for terminating their exclusive relationship without just cause. *See* 289 F. Supp. at 139. The principal counterclaimed, alleging that it was the distributor that had terminated the relationship, causing damages to the principal. *See id.* The distributor moved to dismiss the counterclaim on the grounds that the agreement lacked a fixed term or a requirement that it could only be terminated for just cause. *See id.* The court granted the distributor's motion and dismissed the counterclaim, holding that because the contract lacked a fixed term, "the two parties to the same remained at liberty to rescind the agreement and bring to an end the commercial relationship established thereunder at any time that they might wish to do so." *Id.* at 140.

The *Castillo* court did not purport to be applying Law 75 in

reaching its holding. This makes sense, as the law, by its terms, only acts as a limitation on *distributors*' rights to terminate distributorship agreements. *See* P.R. LAWS ANN. tit. 10, § 278a (providing that "no principal or grantor" may act to the detriment of a distributorship agreement without just cause). As Ferraiuoli would have noticed if it had researched *Castillo*'s citation history, at least one other court has thus noted that *Castillo*'s holding applies only to the termination of contracts without fixed terms *by distributors. See Nike Int'l Ltd. v. Athletic Sales, Inc.*, 689 F. Supp. 1235, 1239 (D.P.R. 1988) ("*Dealers* have a recognized right to rescind a distributorship agreement if they so desire." (emphasis added)).[22]

   More to the point, further research on Ferraiuoli's part would have revealed that the cases have applied Law 75's protections to contracts without fixed terms. The First Circuit, relying on precedent from the Puerto Rico Supreme Court, has recognized that distributors under Law 75 may include those who have continuing but indeterminate-length relationships with a principal. *Triangle Trading Co. v. Robroy Indus., Inc.*, 200

---

**22.** To the extent that *Nike* suggests that *Castillo* was decided under Law 75, we think it both incorrect and in tension with later, controlling precedent from the First Circuit and the Supreme Court of Puerto Rico.

F.3d 1, 4 (1st Cir. 1999) (noting that the Puerto Rico Supreme Court had "restrict[ed] the definition of a dealer to 'an independent entrepreneur who has established a continuing relationship, *either fixed or indeterminate*, with another principal for the distribution of a product or service'" (quoting *Roberco, Inc. v. Oxford Indus., Inc.*, 122 D.P.R. 115, 131 (1988)) (emphasis added)). *Triangle Trading* and *Roberco*[23] thus stand for the proposition that a distributor with a continuing relationship lacking a fixed term may qualify for the protections of Law 75. Courts in this district have explicitly recognized as much. *See, e.g., A.M. Capen's Co. v. Am. Trading & Production Corp.*, 200 F. Supp. 2d 34, 37 n.3 ("Under Law 75, the lack of termination date in the dealer contract does not create any problems because said law protects all agreements, even those lacking a fixed term.").

This interpretation is confirmed by the Puerto Rico Supreme Court's opinion in *Lorenzana Torres v. Gen. Accident Ins. Co.*, 154 D.P.R. 547 (2001). There, a putative distributor sued a principal under Law 75. *See id.* at 551. The primary dispute

---

**23.** As stated in *Oliveras, Inc. v. Univeral Ins. Co.*, 141 D.P.R. 900, 915 n.14 (1996), *Roberco* was superseded by statute as to matters not relevant to our discussion here.

before the Court was whether the putative distributor qualified as a dealer under the Law. *See id.* at 552 ("One of the central questions in the application of Law 75 is the definition of 'distributor.'") (translation ours). Based on the factors elucidated in *Roberco* and *Triangle Trading*, the Court concluded that the plaintiff was not a dealer for the purposes of Law 75, and that he was therefore not entitled to the Law's protections. *See id.* at 565 (concluding that "Law 75 is not applicable to this case"). Notably, the contract between the parties in *Lorenzana Torres* lacked a fixed term, *see id.* (noting that the agreement "did not establish the duration of said contractual relationship"), but the Court found that fact of no relevance to the Law 75 analysis. However, it concluded that the lack of a fixed term *was* of critical importance once it was determined that Law 75's protections didn't apply, because in such a case the contract was terminable at will by either party. *Id.* at 566 (holding that because a "service contract with no fixed term of duration may be terminated by any of the contracting parties," the defendant "was free to terminate the contractual relationship without just cause" (citing *Figueroa Piñero v. Miranda & Eguía, Inc.*, 83 D.P.R. 554 (1961))). This confirms that indeterminate-length contracts fall within the ambit of Law 75. Moreover, it confirms that

*Castillo* correctly applied general contract law principles in the absence of Law 75 protections, holding that in such a case, the contract was terminable at will. *Cf. Quality Constr. Chem., Corp. v. Sika Corp.*, 389 F. Supp. 2d 246, 252 (D.P.R. 2005) (recognizing that *outside the Law 75 context*, contracts without fixed terms are terminable at will);[24] *A.M. Capen's Co.*, 200 F. Supp. 2d at 48–49 (same).

We must find, therefore, that in suggesting that *Castillo*—or, for that matter, whether or not the agreement had a fixed term—was applicable to the question of whether Méndez could be terminated, Ferraiuoli was negligent insofar as it failed to correctly apprise Florida Natural of the correct state of the law.[25] Thus, when Ferraiuoli suggested that Florida Natural "would be able to terminate the relationship" because, arguably, the relationship lacked a fixed term, *see* Docket No.

---

**24.** We note that although *Quality Construction* involved the termination of an exclusive distributorship relationship, the plaintiff's claim was only for breach of contract, *not* for a violation of Law 75. *See Quality Constr. Chem., Corp. v. Sika Corp.*, 389 F. Supp. 2d 246, 247 (D.P.R. 2005).

**25.** Notably, at no point during the briefing of the motions for summary judgment in this case has Ferraiuoli even attempted to defends its reliance on *Castillo* or the distinction between fixed and indeterminate length contracts in the Law 75 context.

48-3, at 3, it did so in contravention of controlling precedent, of which it should have been aware, from both the First Circuit and Supreme Court of Puerto Rico, as well as on-point precedent from other courts in our district. Ferraiuoli is not saved by the fact that, after suggesting that the contract was terminable, it wrote: "Nonetheless, when contracts provide a term, and/or provide for renewals, principals can only terminate the agreements based on 'just cause.'" *Id.* This sentence repeats the memo's original error by suggesting that whether or not the contract has a fixed term is a relevant consideration.[26] In truth,

---

26. Moreover, and contrary to the inference that Ferraiuoli would have us draw, the sentence does not actually state that Florida Natural's agreement with Méndez, as of the time of the memo's drafting, was for a fixed term. The memo, in fact, explicitly states that it might not be. We therefore flatly reject Ferraiuoli's suggestion, in its opposition to Florida Natural's motion for summary judgment, that Beléndez's memo "stated that just cause was needed for a contract such as the one [Florida Natural] had with Méndez." Docket No. 60, at 6. It is beyond dispute that the memo suggested that Florida Natural *might* have the right to terminate the agreement at will. *See* Docket No. 48-3, at 3 ("It can be argued that since the relationship has continued without any additional agreement being executed, that as of today, the Contract does not specify the term, thus, it is indefinite. As such, [Florida Natural] would be able to terminate the relationship . . . ."); *see also* Docket No. 50-8, at 47 (recommending that a counterclaim be filed arguing that the agreement had "an indefinite term and therefore could have been terminated at will"). Indeed, the only reason that it would

whether the contract was for a fixed or indefinite term, Law 75 applied so long as theirs was a "dealer's contract" under the law. *See* P.R. LAWS ANN. tit. 10, § 278 (defining "dealer's contract"). Put simply, the only fair reading of the memo is that it suggests that Florida Natural's contract with Méndez might be indefinite, and, because of this fact, it might be terminable at will.[27] *See* Docket No. 48-3, at 3. The memo is very clear that, if these things were true, just cause was not necessary to terminate the contract. In making these suggestions, the memo was incorrect.

Because we reject its reading of the memo, and because we

---

have made sense to discuss the supposed distinction between indeterminate and fixed length contracts was to suggest that the former, but not the latter, were terminable at will. If, as Ferraiuoli now suggests, the memo was clear about the need for just cause in either case, the *Castillo* section would have been nothing but surplusage.

**27.** We note that Ferraiuoli repeated this error in its January 10, 2014, memo when it suggested that because the original agreement had expired, the parties' subsequent relationship was arguably indefinite and, therefore, potentially terminable at will. *See* Docket No. 50-8, at 38–39. Though by January 2014 Ferraiuoli had recognized that *Castillo* was factually distinguishable, *see id.* at 39 n.3, it still failed to recognize the underlying error in relying on *Castillo*. By November 2010, however, Ferraiuoli had ceased relying on *Castillo* at all. *See id.* at 50–54 (email of November 23, 2010).

find that the memo contains a significant error of law in violation of its duty to Florida Natural, we must deny Ferraiuoli's motion for summary judgment as to this claim. But we must deny Florida Natural's as well, because we are unable to hold, as a matter of law, that Ferraiuoli's negligence proximately caused Florida Natural's damages. The Beléndez memo erred in suggesting that *Castillo* might have relevance to Florida Natural's relationship with Méndez, but it did so in language that was far from forceful. Rather than state directly that the agreement was indefinite, Beléndez wrote that "[i]t can be argued" that the agreement was indefinite after the original agreement's expiration in 2005. Docket No. 48-3, at 3. This language lacked certainty, a fact that is significant given what immediately followed: a lengthy discussion of the need for just cause in terminating distributorship contracts under Law 75. *See id.* at 3–6. We therefore read the memo as suggesting that while Florida Natural *might* be entitled to terminate the contract without just cause, it also *might* need to be prepared to show just cause for that termination—the memo suggests that the question was unsettled. Furthermore, the memo's recommendation was not that Florida Natural go out and unilaterally and without notice cancel its contract with Méndez. To the

contrary, the much more conservative course suggested by Beléndez was that Florida Natural "confirm in writing that Méndez acknowledges that the original agreement is still in place, thereby continuing the non-exclusiv[e] nature of the agreement. That way, contracting with other distributors would be permitted without [Florida Natural] incurring any liability." *Id.* at 7.

Given the measured tone of Ferraiuoli's memo, it is far from certain that it could have reasonably foreseen Florida Natural's decision to rely on one portion of the memo as the basis for immediately terminating its relationship with Méndez. That said, we would not grant summary judgment in favor of Ferraiuoli on these grounds because it was its error that created the false impression in the mind of Florida Natural's representatives that the contract *might* be terminable at will. Had Ferraiuoli been more diligent in drafting its memo, such an impression would never have arisen in the first place. And Latham's email, to which the memo responded, *did* mention the possibility of litigation. For these reasons, we conclude that the question of proximate cause should be decided by a jury after hearing evidence regarding the memo and Florida Natural's reliance on it. Moreover, it could be argued that

Florida Natural was contributorily negligent in relying on the memo as its sole legal basis for terminating its relationship with Méndez. *See, e.g., Arnav Indus., Inc. Ret. Trust v. Brown, Raysman, Millstein, Felder & Steiner, L.L.P.*, 751 N.E.2d 936, 939 (N.Y. 2001) (holding that contributory negligence may be pleaded "as a mitigating factor in the attorney's negligence"), *overruled on other grounds by Oakes v. Patel*, 988 N.E.2d 488 (N.Y. 2013). In such a case, a jury, rather than this court, would be required to apportion liability. *See Alejandro-Ortiz v. P.R. Elec. Power Auth.*, 908 F. Supp. 2d 290, nn.8–9 & accompanying text (D.P.R. 2012) (noting that the apportionment of liability is a question for a jury).

To the extent that Ferraiuoli argues that Florida Natural's settlement with Méndez precludes a finding of damages, *see* Docket No. 49, at 21, we disagree. This is not a case where the attorney's error caused a risk of loss, inducing the client to settle even though he would have won on appeal. *See, e.g., Nielson v. Eisenhower & Carlson*, 100 Wash. App. 584, 599 (2000) (holding that because the plaintiffs would have won on appeal "with or without" their attorney's negligence, that negligence was not the cause-in-fact of the plaintiffs' loss). The fact of settlement is not an absolute bar to recovery in legal malprac-

tice cases. *See id.* at 590–91 (holding that settlement does not
bar recovery, so long as the plaintiffs can show that the attor-
ney's negligence proximately caused their loss). Here, the
allegation is that Ferraiuoli gave Florida Natural negligent
advice, and that, in acting on that advice, Florida Natural
became involved in expensive litigation that it otherwise could
have avoided. We conclude that such expenses are recoverable
as damages if proximate cause is proved. *See* 1 LEGAL MAL-
PRACTICE § 8.5 ("[E]rroneous advice can involve the client in
litigation or prolonged litigation. Those expenses may be the
only damages sustained and can be recoverable as direct
damages."); *see also* 3 LEGAL MALPRACTICE § 21:6 ("A frequent
result of negligent advice is that the client is sued, incurs the
cost of defense, and, of course, liability. The cost of avoidable
litigation or unnecessary legal services, ultimately, may be
chargeable to the attorney as damages.").

For all of these reasons, the parties cross-motions for
summary judgment are denied with regard to this claim.

### B. The Counterclaims

The motions discuss two separate counterclaims, both of
which went unfiled. The first was to be a counterclaim seeking
a declaration that Florida Natural either had a right to termi-

nate the agreement at will or had sufficient just cause to do so. This counterclaim was specifically recommended by Ferraiuoli in its January 14, 2010, memo. *See* Docket No. 50-8, at 47. The second counterclaim was for collection of monies, and it was discussed in an email from Beléndez to Latham on February 18, 2010. *See id.* at 48. It is undisputed that both counterclaims were written but never filed.

As to the decision not to file the declaratory judgment counterclaim, Ferraiuoli's position is that the filing was unnecessary because the result that would have been achieved through the counterclaim was sufficiently accomplished through Ferraiuoli's pleading of just cause and expiration as affirmative defenses in the answer to the complaint. *See* ANSWER, *Méndez & Co.*, Civ. No. 09-2251(JAF), ECF No. 9, at 7–10 (D.P.R. filed Feb. 19, 2011) (outlining affirmative defense of just cause). In opposing Ferraiuoli's motion, the only injury alleged to have been suffered by Florida Natural as a result of Ferraiuoli's failure to file a counterclaim relates solely to the collection of monies claim. *See* Docket No. 63, at 6 ("As a result of not filing the counterclaim . . . [Florida Natural] was precluded from recouping from Méndez the monies that Méndez owed [Florida Natural] . . . ."). As we see it, the

decision by Ferraiuoli not to file the declaratory jugdment action was a reasonable exercise of its judgment, one that was not even incorrect, to say nothing of negligent, and one that seems not to have even allegedly injured Florida Natural.[28] As such, we would grant Ferraiuoli's motion for summary judgment as to the declaratory judgment counterclaim.

As to the failure to file the collection of monies counterclaim, however, Ferraiuoli acted negligently. In Beléndez's February 18, 2010, email, she writes that Ferraiuoli would not be filing the collection of monies counterclaim because the amount in controversy in the claim—$22,491.00—was too low to create federal jurisdiction; the claim, she wrote, would have to be brought in state court. *See* Docket No. 50-8, at 48.

Under Rule 13, counterclaims are either compulsory or permissive. Compulsory counterclaims are claims arising "out of the transaction or occurrence that is the subject matter of the opposing party's claims" and which do "not require adding another party over whom the court cannot acquire jurisdic-

---

**28.** In its opposition to Florida Natural's motion for summary judgment, Ferraiuoli points out this proximate cause problem. *See* Docket No. 60, at 13. In its reply, however, Florida Natural fails to address the matter of injury and causation at all. *See* Docket No. 76.

tion." FED. R. CIV. P. 13(a)(1). A defendant is required to make any compulsory counterclaims available to it. *Id.* It is well established that compulsory counterclaims do not need independent bases for jurisdiction. *See* 6 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1409 (3d ed.) ("Because it is closely related to the subject matter of the action, a counterclaim under Rule 13(a) is within the court's supplemental jurisdiction and an independent basis for federal jurisdiction is not necessary."). The term "permissive counterclaim" encompasses any other claim a party may have against an opposing party. *See* FED. R. CIV. P. 13(b). Traditionally, permissive counterclaims "require[d] their own jurisdictional basis." *Iglesias v. Mutual Life Ins. Co. of N.Y.*, 156 F.3d 237, 241 (1st Cir. 1998).[29] Here, Méndez sued Florida Natural for unjust

---

**29.** This was certainly the law in this jurisdiction at the time Beléndez wrote her email. A month later, however, the First Circuit overruled *Iglesias* and held that permissive counterclaims that were part of the "same case or controversy" as the original action did not require their own jurisdictional basis. *Global NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 87 (1st Cir. 2010). In reaching this conclusion, the First Circuit relied on a 1990 statute that expanded federal courts' supplemental jurisdiction. *Id.* (citing 18 U.S.C. § 1367). However, *Iglesias* was decided in 1998, well after § 1367 became law, and so we cannot conclude that Beléndez should have anticipated the First Circuit's reversal.

termination under Law 75, which is effectively a special, statutory breach of contract action. *See, e.g., Basic Controlex Corp. v. Klockner Moeller Corp.*, 202 F.3d 450, 454 (1st Cir. 2001) ("The question thus becomes whether Act 75 governs Basic Controlex's 'breach of contract' claim. Clearly it does."); *A.M. Capen's Co. v. Am. Trading & Production Corp.*, 202 F.3d 469, 473 (1st Cir. 2000) (referring to Law 75 as creating "an additional remedy for . . . breach of contract"); *Triangle Trading Co. v. Robroy Indus., Inc.*, 952 F. Supp. 75, 76 (D.P.R. 1997) (referring to a plaintiff's case for "breach of contract under Act[] 75"). Florida Natural's unfiled counterclaim was for collection of monies due under the same contract. It is well established "that in a breach-of-contract action, a claim by defendant for . . . overpayment . . . or for payments due" is compulsory. 6 FEDERAL PRACTICE AND PROCEDURE § 1410.1; *cf. Bottero Enters., Inc. v. S. New England Production Credit Ass'n*, 743 F.2d 57, 59 (1st Cir. 1984) (holding that a claim should have been brought as a compulsory counterclaim when it related to the same underlying agreement as the original claim); *Brandt v. Advanced Cell Tech., Inc.*, 349 F. Supp. 2d 54, 58 (D. Mass. 2003) (holding that a breach of contract counterclaim was compulsory in action for payment on notes arising out of same transaction or

occurrence).

We conclude that Florida Natural's collection of monies action needed to have been brought as a compulsory counterclaim to Méndez's action. Contrary to Beléndez's analysis, moreover, it did not need an independent jurisdictional basis. Her decision not to file the counterclaim on this basis was, therefore, in error and negligent.[30] Even so, several fact issues remain. First, Beléndez gave a second reason for not filing the counterclaim, and it would be for a jury to decide whether that second justification was reasonable and controlling. Second, the case-within-a-case framework is clearly applicable to this claim, but neither party has given us enough information to decide one way or the other whether Florida Natural would have prevailed on its collection of monies action had it been filed. And third, it is not at all clear to us that it was Beléndez's negligence—rather than Florida Natural's own actions—that resulted in the collection of monies claim being barred,

---

**30.** Ferraiuoli at no point defends the merits of Beléndez's decision not to file the collection of monies counterclaim. Beléndez, for her own part, admitted during her deposition that she had not considered whether the collection of monies counterclaim was permissive or compulsory, nor had she researched the different jurisdictional demands of each. *See* Docket No. 50-8, at 15–17.

meaning that conclusive evidence of proximate cause is currently lacking in the record.[31]

Florida Natural's motion is denied as to this claim; Ferraiuoli's is granted in part and denied in part.

## C.  The Just Cause Defense

---

**31.** What we mean is this. As a general matter, where an "action proceeds to judgment without the interposition of a [compulsory counterclaim], the counterclaim is barred." FED. R. CIV. P. 13 advisory committee's note. The judgment in the underlying action here was not on the merits, however; it was a voluntary dismissal on the stipulation of all parties, negotiated by attorneys other than Ferraiuoli's, which expressly barred all claims that could have been brought. *See* SETTLEMENT AGREEMENT, *Méndez & Co., Inc. v. Citrus World Inc.*, Civ. No. 09-2251(JAF), ECF No. 65-1, at 1 (D.P.R. filed April 27, 2011); *see also* FED. R. CIV. P. 41(a)(1)(A)(ii). In similar circumstances, courts have recognized the right of the settling defendant in the first action to reserve its right to bring the counterclaim; others have held that non-merits judgments can *never* preclude unfiled counterclaims. *See* 6 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1417 nn.14–15 & accompanying text (3d ed.). The First Circuit, by contrast, has held that at least in some circumstances, a settlement in the first action might bar a later action asserting what should have been brought as a compulsory counterclaim. *See Dindo v. Whitney*, 451 F.2d 1 (1st Cir. 1971). We see it as an open question whether Florida Natural's collection of monies claim is barred because of Beléndez's failure to file it or because of Florida Natural's subsequent decision, when otherwise represented, not to bargain for its reservation. We also cannot know at this time whether the settlement amount in the underlying case accounted for the monies Florida Natural claims it was owed. Because the parties have not briefed these questions, we will not decide them at this time.

According to Florida Natural, its just cause defense to Méndez's lawsuit was eviscerated by Ferraiuoli's decision to file answers to written discovery admitting that the 2004 agreement executed between Florida Natural and Méndez was the complete agreement between the parties. According to Florida Natural, that agreement was only "partial," and there was some *other* agreement that encompassed other duties that Méndez owed to Florida Natural. Florida Natural's contention is that Ferraiuoli's negligence resulted in the judge in the underlying action granting partial summary judgment in favor of Méndez and determining that the signed 2004 agreement represented the entire agreement between the parties. *See Méndez*, Civ. No. 09-2251(JAF) (D.P.R. March 24, 2011) (order granting partial summary judgment).

There are several problems with Florida Natural's theory. First, Ferraiuoli *did not* admit that the 2004 agreement was the complete and only distribution agreement between the parties. What it admitted—and what Florida Natural also complains about, *see* Docket No. 63, ¶ 5.2—is Ferraiuoli's admission that Méndez always met or exceeded the minimum annual sales requirements under the agreement. But there is no suggestion here by Florida Natural that this admission was factually

incorrect. Plus, Florida Natural and its outside counsel reviewed the discovery submissions, and they may have a contributory role in any negligence for that reason.

More crucially, there is no evidence in the record before us that supports the existence of an actual *agreement* outside of the one executed in 2004. It is true that there was a course of dealing that involved annual marketing plans and various promotions, but the undisputed facts confirm that for the most part these were one-off side agreements, implemented at Florida Natural's sole discretion. Moreover, in opposing partial summary judgment in the underlying action, Goldman Antonetti was able to argue that the annual marketing plans constituted "essential obligations agreed to and executed by the parties" that "supplement" the 2004 letter agreement. FLORIDA NATURAL'S OPPOSITION TO MÉNDEZ'S MOTION FOR PARTIAL SUMMARY JUDGMENT, *Méndez*, Civ. No. 09-2251(JAF), ECF No. 41, at 2–4 (D.P.R. filed Feb. 7, 2011). The judge in the underlying case did reject this argument, noting that the letter had an integration clause and that, even if it didn't, he would not hold that the side agreements regarding marketing were part of the contract. *Méndez*, Civ. No. 09-2251(JAF), ECF No. 60, at 3 (D.P.R. March 24, 2011). He further found that there was

insufficient ambiguity to allow extrinsic evidence of Florida Natural's interpretation. But we fail to see any connection between Ferraiuoli's alleged negligence and the court's holding; indeed, given the letter agreement's merger clause, we do not see how the court could have held differently, even on the facts before *us*. *See Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 15–16 (1st Cir. 1996) (holding that under Puerto Rico law, merger clauses "bar consideration of extrinsic evidence to vary the express, clear, and unambiguous terms of a contract"); *see also Executive Leasing Corp. v. Banco Popular de P.R.*, 48 F.3d 66, 69 & n.5 (1st Cir. 1995) (rejecting extrinsic evidence of the parties' "actual practice" where the contract was unambiguous and contained a valid merger clause). Florida Natural fails to offer any evidence suggesting that the result would have been different had Ferraiuoli answered written discovery in a different manner, and we do not believe it would have been. Ferraiuoli's motion for summary judgment is granted as to this claim.

### IV.    AIG's Motion for Partial Summary Judgment

AIG, Ferraiuoli's malpractice insurer, seeks a declaration via a motion for partial summary judgment that it cannot be liable for any damages owed to Florida Natural that take the

form of attorneys' fees. AIG's argument stems from language in the insurance policy defining damages as

> sums payable pursuant to judgment against the Insured and/or settlements negotiated by the Company and consented by the Insured and includes interest on any judgment which accrues after the entry of a judgment and before the Company has paid. Damages also includes punitive and/or multiple/exemplary damages to the extent such damages are insurable under the law of any jurisdiction which has substantial relationship to the Insured, the Company, this Policy, or the Claim and which is most favorable to the insurability of such damages.
>
> Damages does not include fines, penalties or any form of criminal sanction, taxes or the return of or reimbursement for legal fees, costs or expenses or any other matter which is deemed to be uninsurable by law governing the policy or subject jurisdiction.

Docket No. 45-2, at 21. According to AIG, this language specifically releases it from the need to pay for damages in the form of attorney's fees. According to Florida Natural and Ferraiuoli, by contrast, this exclusion applies only to a narrow class of actions, such as those seeking the return of fees that were overpaid.

We will begin with what the policy unambiguously *does* cover, because we think it provides necessary context to a discussion of the exclusion at issue. Under the policy, AIG will pay for any amounts that Ferraiuoli becomes "legally obligated to pay *as damages* because of any claim" for legal malpractice against Feraiuoli. Docket No. 45-2, at 3 (emphasis added). The specific endorsement regarding damages further defines it to include sums payable because of "judgments against" or "settlements . . . consented to by" Ferraiuoli. *Id.* at 21. What is not included are sums that, traditionally, would not be compensatory damages, awarded as a result of a judgment or settlement: fines, penalties, criminal sanctions, taxes, costs, *and legal fees*. *Id.*

In this vein, some courts have interpreted the exclusion for the "return" of fees as relieving the insurer from the duty to pay for, *e.g.*, claims for excessive fees. *See, e.g., NormanShabel, P.C. v. Nat'l Union Fire Ins. Co.*, 923 F. Supp. 681, 684 (D.N.J. 1996) (finding no coverage where the claim was "merely an attempt to recoup excessive fees paid to the attorney" (citing *Hofing v. CNA Ins. Cos.*, 588 A.2d 864 (N.J. App. 1991)). Other courts have held that "return" or "restitution" language permits recovery for "a judgment or settlement" but not for the

fees incurred by the plaintiff in securing that judgment or settlement. *Weisberger v. Home Ins. Co.*, 76 Ohio App. 391, 395 (1991). Thus at least certain categories of fees—like those incurred because the malpractice plaintiff had to hire new counsel in the underlying action—should not be construed as a claim for the "return" of fees. *See Hofing*, 588 A.2d at 869; *see also Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1413 (D.C. Cir. 1995) (following *Weisberger* and holding that at least some fee requests are damages, not claims for "return" of fees).

With this background, we conclude that the exclusion from the definition of damages of claims for the "return" of legal fees does not limit in any way the extent of AIG's coverage of Ferraiuoli's negligence. It seems to us beyond argument that if Ferraiuoli's negligence caused Florida Natural to incur legal expenses to hire other counsel to fix Ferraiuoli's mistakes, those fees are, in fact, consequential damages covered under the policy. *Hofing,* 588 A.2d at 869. At least within the facts of this case, we think the same is true of the fees paid by Florida Natural to Ferraiuoli.[32] Keeping in mind that the claim alleges damages, in terms of fees and costs, for having had to engage

---

**32.** To the extent that *Hofing* suggests a different result, we choose not to follow it.

in needless litigation, we think that an action to recover for the fees thus expended is one for consequential damages arising from the underlying negligence. In each case, the fees would be awarded as part of a judgment against Ferraiuoli for its professional negligence; in neither case would Florida Natural be seeking to recover excessive fees or fees incurred in prosecuting this action. The "return of fees" language therefore does not preclude recovery.

The question is whether the result is altered by the language excluding from damages "reimbursement" of fees, as to which we have found no on-point caselaw. Nonetheless, the terms' plain meaning tells us that "reimbursement" is a broader term than "return." Return implies an action to recover fees actually paid *to the insured*; reimbursement might include fees paid to other firms.[33] Even so, and taking the term in the context of the policy as a whole, we see no reason to conclude that it excludes from payment anything other than legal fees *qua* legal fees. This fits with the phrase's surrounding language, because attorney's fees—like costs, penalties, and

---

**33.** That is, Florida Natural could not logically ask Ferraiuoli to "return" the fees that it in incurred in hiring Goldman Antonetti, but it could ask for reimbursement of those fees.

fines—are traditionally "not compensable damages." *Cordeco Dev. Corp. v. Santiago-Vazquez*, 539 F.2d 256, 262 (1st Cir. 1976); *see also* Docket No. 45-2, at 21 (excluding "the return or reimbursement of legal fees, costs or expenses"). But in a legal malpractice case, fees paid in the underlying action can take on a different character; they are compensable damages flowing directly from the malpractice defendant's negligence. *See* 3 LEGAL MALPRACTICE § 21:6 (defining as "direct damages" those "legal expense[s] incurred as a consequence of the attorney's negligence"). For this reason, and considering that in many malpractice cases attorneys' fees "may be the only damages sustained," *id.*, it would make little sense to read out coverage of such claims from the professional liability policy. We conclude instead that the policy's unambiguous language requires that AIG pay for fees chargeable to Ferraiuoli as malpractice damages. Under this analysis, AIG will be require to pay Ferraiuoli for any damages that it has to pay Florida Natural regarding fees that Florida Natural incurred due to the work of Ferraiuoli or other firms. It will not, however, have to reimburse Ferraiuoli for any attorney fees awarded to Florida Natural or incurred by Ferraiuoli in *this* action, unless that

payment is otherwise required by the policy.[34] AIG's motion is accordingly granted in part and denied in part consistent with this opinion.

## V. Conclusion

For all of the reasons stated above, Ferraiuoli's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Florida Natural's is DENIED. AIG's is GRANTED IN PART and DENIED IN PART. Specifically, we dismiss Florida Natural's claims regarding Ferraiuoli's answers to written discovery, as well as Ferraiuoli's failure to file a declaratory judgment counterclaim. However, we find that Ferraiuoli acted negligently in its drafting of the November 16, 2009, memo, as well as when it failed to file a collection of monies counter-claim. At trial, Ferraiuoli will not be permitted to dispute these findings of negligence. Thus, trial as to those claims will focus

---

**34.** In its opposition to AIG's motion for summary judgment, Florida Natural suggests that AIG should be responsible for any attorneys' fees awarded to Florida Natural in *this* litigation. *See* Docket No. 61. As we explain above, we agree with AIG's position, *see* Docket No. 78, at 3, that such fees are excluded by the policy's damages definition. Thus, we grant AIG's motion for summary judgment insofar as it seeks a declaration that is not responsible for any fees awarded against Ferraiuoli for its actions in *this* litigation. The motion is otherwise denied.

on proximate causation, contributory negligence, and damages.

The Court intends to go to trial by the end of September 2014. To that end, the parties must file, within ten days, a joint motion proposing three dates before November 1, 2014, on which all are available to begin trial. However, the Court is of the opinion that trial is a dangerous option for all parties. On the one hand, Ferraiuoli has surely acted negligently; on the other, Florida Natural may have a hard road ahead in proving that its damages were proximately caused by that negligence. As such, the Court intends to quickly hold a settlement conference in this case. Within ten days, the parties shall jointly inform the Court of three dates before the end of April 2014 on which they are available to hold a settlement conference.[35]

IT IS SO ORDERED.

In San Juan, Puerto Rico, this _____.

<u>S/ SILVIA CARREÑO-COLL</u>

UNITED STATES MAGISTRATE JUDGE

---

**35.** Florida Natural's motion for a status conference, Docket No. 82, is therefore MOOT.